**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEPHON M. BENNETT,<br>    Plaintiff, | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 25-CV-5433** |
| | : | |
| DR. GLUSHAKOW, *et al.*,<br>    Defendants. | : | |
| | : | |

**MEMORANDUM**

**PADOVA, J.**                                                          **MAY 20, 2026**

Plaintiff Stephon M. Bennett, a prisoner currently confined at SCI Albion, brings this

civil action against Defendants Dr. Glushakow (a psychiatrist), Beth Stuebner (a Registered

Nurse) and Hensley (a Deputy Superintendent), claiming that he was denied medical care while

incarcerated at SCI Phoenix and then transferred from that facility in retaliation for filing

lawsuits and in breach of a settlement agreement.  The Defendants have moved to dismiss

Bennett's claims against them.  For the following reasons, the Court will dismiss the civil

conspiracy claim against Dr. Glushakow based on the allegedly retaliatory transfer and otherwise

deny the Motions.

**I.      FACTUAL ALLEGATIONS**[1]

In September 2020, Bennett signed a settlement agreement with the Pennsylvania

Attorney General's office to resolve a civil case he filed against employees of the Pennsylvania

---

[1] The following allegations are taken from the Amended Complaint, (ECF No. 14), which is the
governing pleading in this case.  *See Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35
(2025) ("If a plaintiff amends her complaint, the new pleading 'supersedes' the old one: The
'original pleading no longer performs any function in the case.'" (citation omitted)).  The Court
has also considered public dockets, where relevant.  The Court adopts the pagination supplied by
the CM/ECF docketing system.

Department of Corrections ("DOC"), *Bennett v. Keel*, Civ. A. No. 17-2414 (M.D. Pa.).  (Am. Compl. ¶ 7.)  He alleges that, pursuant to the settlement, the DOC agreed to house him at SCI Phoenix and not to relocate him without to a "genuine penological interest."  (*Id.* ¶¶ 8-9.) Bennett suffers from various conditions including post-traumatic stress disorder, major depressive disorder, and borderline personality disorder, and has a history of at least seven suicide attempts, cutting himself with razors, and psychiatric commitments.  (*Id.* ¶¶ 23, 28, 30, 60.)  Upon his transfer to SCI Phoenix pursuant to the settlement agreement, he was housed in the facility's Residential Treatment Unit, which "provide[s] structure, consistency, and support to individuals who have been diagnosed with a serious psychiatric disorder and/or a serious impairment with psychological functioning."  (*Id.* ¶¶ 14-16.)

In January 2022, Bennett filed a civil rights action against staff at SCI Phoenix, including Dr. Glushakow, after learning that "he was being voted off the treatment unit," *Bennett v. Colon-Ortiz*, Civ. A. No. 22-1591 (E.D. Pa.).  (*Id.* ¶¶ 17-18.)  Dr. Glushakow filed a motion to dismiss that was denied.  (*Id.* ¶ 19); *see Bennett v. Pennsylvania Dep't of Corr.*, No. 22-1591, 2024 WL 1486141, at *4 (E.D. Pa. Apr. 4, 2024).  Less than thirty days later, on May 2, 2024, Bennett was moved to R-block, a general population unit with a reputation of being "the most violent housing unit at SCI Phoenix."  (Am. Compl. ¶¶ 20-22, 26.)

Bennett declined quickly on R-Block.  He began to feel "hopeless, detached, targeted, abandoned, [and] irritable and slipped into a depression where he lost his appetite, skipped meals, isolated inside his cell, experienced thoughts/feelings of suicide and failed to receive a single hour of sleep for five consecutive days."  (*Id.* ¶ 27; *see also id.* ¶¶ 23-26.)  On May 7, 2024, at approximately 9:15 p.m., Bennett "experienced a serious emergent mental break wherein he broke his $250.00 t.v., his fan, [and] a cell window, cut his hand and destroyed his

sneakers and hygiene products." (*Id.* ¶ 29.)  In response, officers attempted to calm Bennett, cuffed him, and escorted him to "trauma triage to be seen by medical staff." (*Id.* ¶ 31.)  Bennett alleges the escort was recorded on video.[2]  (*Id.* ¶ 33.)

At the medical department, Defendant Stuebner "was informed by security officers that [Bennett] suffered some sort of mental issue after being up for five days." (*Id.* ¶ 37.)  The officers never suggested that the incident was drug-related or "anything but mental health related." (*Id.* ¶ 38.)  Stuebner placed a call to the on-call psychiatrist. (*Id.* ¶ 39.)  According to Bennett, per policy, the on-call psychiatrist would have been required to access the automated mental health tracking system when fielding the call, which would have revealed Bennett's extensive mental health history and indicated that Bennett "was in need of urgent psychiatric care, in a fragile mental state and was a danger to himself." (*Id.* ¶¶ 59-61.)  Bennett overheard Stuebner's end of the phone conversation, which he summarizes as follows:

> Dr. G., I have Bennett here.  He suffered some sort of mental break on R block tonight.  Says he's been up for five days, destroyed his cell, broke his t.v. and cell window and cut his hand.  Are we admitting him to P.O.C.?
>
> (Brief pause as Stuebner listens) Then . . .
>
> Ooh, Bennett likes to sue us claiming we don't do our jobs, okay.  So admit him to P.O.C. don't put it down as mental health issue but a security one and say he was high when he trashed his cell.  Okay.  Got it.
>
> (Brief pause) Then . . .
>
> Oh, we won't have to worry about him too much longer because he's gonna be transferred because of the lawsuit.  Ok Dr. G.

(*Id.* ¶¶ 45-48.)  Upon hearing this conversation, Bennett turned to the officers who were still recording the events, and stated,

---

[2] The escort video was allegedly preserved as requested by Bennett in a grievance.  (Am. Compl. ¶ 51.)

>What are they talking about I'm gonna be transferred because of the lawsuit?  I'm
>having mental health problems, been up for five days, it's 10 o'clock at night and
>they're talking about I'm high.  I'm not high.

(*Id.* ¶¶ 48-49.)  The officers did not respond.  (*Id.* ¶ 50.)  Bennett was then placed in a psychiatric

observation cell.  (*Id.* ¶ 54.)

Bennett was released from the psychiatric observation cell at 6:00 p.m. the next day after

being "green lighted by security."  (*Id.* ¶¶ 63-64.)  He "was not examined or assessed/treated by

a single member from the psychiatry department" while housed there.  (*Id.* ¶ 64.)  Shortly after

his release, he was taken to the Restricted Housing Unit ("RHU"), where he received a notice

"proclaiming him to be a danger to some persons within the institution."  (*Id.* ¶¶ 65, 67.)  Two

days later, he was told he would be transferred because of a "staff separation."  (*Id.* ¶ 68.)  The

separation precipitated from an allegedly "false" report accusing Bennett of acting

inappropriately toward a female staff member, which was filed on May 8 by another defendant in

Bennett's pending 2022 lawsuit whom Bennett describes as a "friend of Dr. Glushakow."  (*Id.* ¶

79.)  When Bennett asked for information about why he was being transferred, a Lieutenant

responded, "You know why?" then mouthed the word "lawsuit" and "smirked."  (*Id.* ¶¶ 69-70.)

On May 15, 2024, Bennett received a hearing, chaired by Defendant Hensley, to

determine whether a transfer was justified.  (*Id.* ¶¶ 73-74.)  Hensley ultimately approved the

transfer.  (*Id.* ¶ 85.)  Bennett alleges that Hensley was aware of his 2020 settlement agreement

and the 2022 lawsuit against Dr. Glushakow, and claims Hensley had reviewed the escort video

capturing Stuebner's conversation with Dr. Glushakow.  (*Id.* ¶¶ 75-80.)  He further claims

Hensley's decision was "pre-determined" and made "solely to punish [him] for filing a lawsuit."

(*Id.* ¶ 85.)

Bennett was transferred to SCI Rockview on July 11, 2024, after spending sixty-five days in the RHU.  (*Id.* ¶¶ 52, 86, 114.)   He requested his medical records pertaining to the May 7, 2024 incident, which revealed Stuebner's note that the incident was "not mental health related," that she recommended a "drug screen," and that she gave permission for use of a restraint chair if necessary.  (*Id.* ¶¶ 52-53.)  She also allegedly "accused Bennett falsely of 'manipulating for own personal gain.'"  (*Id.* ¶ 53.)  The records also falsely reported Stuebner spoke with CRNP Brandee Dukes, rather than Dr. Glushakow, which Bennett believes is reflective of Stuebner's effort to misrepresent events after having been informed by one of the escorting officers that Bennett overheard her phone conversation.  (*Id.* ¶ 56.)  Bennett also suggests that Dr. Glushakow directed Stuebner to falsify his medical records to avoid having the records used against him in the pending lawsuit.  (*Id.* ¶ 58.)

Based on these events, Bennett brings claims for deliberate indifference to his serious medical needs, retaliation, and civil conspiracy against Dr. Glushakow and Nurse Stuebner, as well as claims for civil conspiracy and breach of contract against Hensley.  (Am. Compl. at 1, 17-21.)  He seeks damages and assorted prospective relief, including a transfer back to SCI Phoenix and removal of the false information in his medical records.  (*Id.* at 20-21.)  The Defendants have moved to dismiss Bennett's claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 27, 36.) Bennett has responded to their Motions. (ECF Nos. 38, 39).

## II.   STANDARDS OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "A challenge to subject matter jurisdiction under

Rule 12(b)(1) may be either a facial or a factual attack." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).  A facial attack does not dispute the facts alleged in the complaint, *id.*, and therefore essentially applies the same standard as a motion under Rule 12(b)(6), *see Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) ("[A] facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party." (citation omitted)).

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citing *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 871 (3d Cir. 1992)).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotations omitted).

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).  Since Bennett is proceeding *pro se*, we construe the

6

Amended Complaint "liberally and hold it 'to less stringent standards than formal pleadings drafted by lawyers.'" *Kalu v. Spaulding*, 113 F.4th 311, 325 (3d Cir. 2024) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (*per curiam*) (citing *Durham v. Kelley*, 82 F.4th 217, 223 (3d Cir. 2023)). It is the defendants' burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

## III.    DISCUSSION

### A.  Eleventh Amendment Immunity

Defendants Hensley and Stuebner argue for dismissal of claims against them in their official capacity based on Eleventh Amendment immunity. (ECF No. 27-2 at 4-7.) The Eleventh Amendment bars suits against a state and its agencies in federal court when the state has not waived that immunity, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66 (1989), and the Commonwealth of Pennsylvania has not waived that immunity for claims under § 1983, *see* 42 Pa. Cons. Stat. § 8521(b). However, the Eleventh Amendment does not bar official capacity claims against state officials where the plaintiff seeks prospective injunctive relief to stop an ongoing violation of federal law. *See Ex parte Young*, 209 U.S. 123 (1908); *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002). Courts reason that injunctions against state officials actively violating federal laws are "necessary to vindicate the federal interest in assuring the supremacy of that law," despite the Constitution's prohibition against suits against the state. *Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)). Determining whether *Ex Parte Young* applies "requires [the Court] to conduct a straightforward inquiry into whether the complaint

alleges an ongoing violation of federal law and whether it seeks relief properly characterized as prospective."[3] *Del. River Joint Toll Bridge Comm'n v. Sec'y Pa. Dep't of Lab. & Indus.*, 985 F.3d 189, 193-94 (3d Cir. 2021) (quotation omitted); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002).

Stuebner and Hensley's sole argument is that *Ex Parte Young* does not apply because, if it did, the Court would have to "delv[e] into the administrative task of deciding in which SCI [Bennett] should reside and in which area of the SCI he should reside."[4]  (ECF No. 27-2 at 7.) Bennett responds that the Court will not have to make this determination given the already-agreed-to settlement governing his SCI placement, and that in any event, the legal question at this stage is only whether his claims fall within the contours of *Ex Parte Young*.  (ECF No. 38 at 12-13.)  Since a retaliatory transfer deprives a prisoner of a status he held prior to his transfer, *i.e.*, placement at the prior institution, courts have held that it is an ongoing violation for which the prisoner can seek prospective relief, *i.e.*, re-transfer, within the bounds of *Ex Parte Young*. *See Rounds v. Clements*, 495 F. App'x 938, 940 (10th Cir. 2012) (holding that a prisoner could bring a claim under *Ex Parte Young* where he alleged "that he is currently, on an ongoing basis, being denied his previous prison placement and many other privileges in retaliation for exercising his First Amendment rights" and sought to restore those privileges); *Saunders v. N.J. Dep't of Corr.*, No. 22-621, 2023 WL 3481463, at *4 (D.N.J. May 16, 2023) (holding that "Plaintiff pleads an ongoing violation of federal law and seeks prospective injunctive relief to remedy the violation" where the amended complaint sought "an order transferring him to the

---

[3] Bennett concedes that he is not raising official capacity claims for damages.  (ECF No. 38 at 16-17.)

[4] They do not address Bennett's request for injunctive relief related to the alleged falsification of his medical records.

Ann Klein Forensic Center"); *Sims v. Kan. Dep't of Corr.,* No. 18-01259, 2019 WL 4450671, at *6 (D. Kan. Sept. 17, 2019) (noting, in permitting a retaliatory transfer claim to proceed under *Ex Parte Young*, that "[t]he Secretary's argument, taken to its logical end, would mean that a retaliatory transfer ceases to be an ongoing violation of federal law once the prisoner reaches his destination.  If this were true, Sims could rely on *Ex parte Young* only if he somehow litigated his claims while in transit between prisons: a feat that would surely impress the most accomplished of litigators and escape artists.").  The one case cited by the Defendants, *Brathwaite v. Phelps*, 602 F. App'x 847 (3d Cir. 2015), is not to the contrary; notably, it does not even mention *Ex Parte Young*.  Accordingly, the Court will deny the motion as to these claims.

### B.  Exhaustion of Administrative Remedies

All the Defendants argue that Bennett failed to exhaust administrative remedies as required the Prison Litigation Reform Act ("PLRA") by failing to timely appeal his grievances to the highest level of review.  (ECF No. 27-2 at 12-15; ECF No. 36 at 7-9.)  The PLRA "mandates that prisoners exhaust internal prison grievance procedures before filing suit." *Small v. Camden County*, 728 F.3d 265, 268 (3d Cir. 2013) (citations omitted); *see also* 42 U.S.C. § 1997e(a).  Exhaustion is a non-jurisdictional "standard affirmative defense." *Perttu v. Richards*, 605 U.S. 460, 469 (2025) (citation omitted).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Prater v. Dep't of Corr.*, 76 F.4th 184, 203 (3d Cir. 2023) (courts "determine whether a prisoner has properly exhausted a claim by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances" (quotation omitted)).  Claims that are not properly exhausted under the PLRA are procedurally defaulted.  *See Woodford*, 548 U.S. at 92-93.  "[W]here a defendant moves to dismiss based on a failure-to-exhaust defense and 'the

9

exhaustion issue turns on [] indisputably authentic documents related to [the inmate's] grievances,' [a court] may consider those documents 'without converting a motion to dismiss to a motion for summary judgment.'" *Rinaldi v. United States*, 904 F.3d 257, 261 n.1 (3d Cir. 2018) (second and third alterations in original) (quoting *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004)).

The DOC's applicable grievance policy, DC-ADM 804, sets forth a three-step process for review of inmate grievances.[5]  An inmate must submit a written grievance to the Facility Grievance Coordinator or his designee within fifteen working days after the event upon which the grievance is based.  DC-ADM 804, § 1.A(5), (8).  An inmate has fifteen working days to appeal a rejected grievance in writing to the Facility Manager.  *Id.* § 2.A(1)(a).  If that appeal is denied, the inmate may appeal for Final Review with the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days of the denial of the Facility Manager's appeal.  *Id.* § 2.B1.b.  A "time extension" will be considered on a "case by case basis" provided the inmate notifies the Chief Grievance Officer of the reason for delay.  *Id.* § 2.B.1.c. The Chief Grievance Officer addressing the extension request will consider the reason given by the inmate and will also consider whether the delay was caused by a transfer or a delay "with mail delivery."  *Id.*  "If it is determined that a delay was caused by," among other things, a transfer or a delay due to mail delivery, "a reasonable extension of time for filing *shall be permitted*."  *Id.* (emphasis added).  "Because a request to extend or be excused from the 15-day deadline . . . is explicitly included as part of the Pennsylvania DOC's grievance procedures, a

_____

[5] Dr. Glushakow appended a copy of DC-ADM 804 to his Motion. (ECF No. 36-1.)  The policy is also available online at https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf (last visited Apr. 16, 2026).

prisoner must request permission to file an untimely" appeal consistent with the DOC's extension procedure. *Talley v. Clark*, 111 F.4th 255, 263 (3d Cir. 2024).

The Amended Complaint describes two relevant grievances—one in which Bennett grieved his claims against Glushakow and Stuebner pertaining to the events of May 7, 2024, identified as Grievance Number 1088135, and a second in which Bennett grieved his "breach of settlement agreement" claim against Hensley, identified as Grievance Number 1089753.  (Am. Compl. ¶¶ 105-06, 110.)  Bennett alleges he appealed his grievance against Glushakow and Stuebner "all the way to final review."  (*Id.* ¶ 107.)  Although he identified this grievance as Grievance Number 1088135, (*id.* ¶ 105), an exhibit to his Amended Complaint reflects an initial response to a Grievance Number 1088624, denying Bennett's grievance "that 'Dr. G' and 'Nurse Beth' acted inappropriately and were retaliatory" because "[t]here is nothing captured on [the] hand-held escort video that was inappropriate by staff."  (*Id* at 33.)  Stuebner argues that "the full file for Grievance No. 1088624 indicates that [Bennett] never took the final required step to appeal that Grievance."  (ECF No. 27-2 at 14; ECF No. 27-3.)  Dr. Glushakow also argues that Bennett failed to exhaust because after subpoenaing SOIGA for "full and complete copies of grievances received by that office pertaining to [Bennett]," (ECF No. 36 at 8), he received only one grievance, Grievance Number 1088231, which pertains to Bennett's mental health stability code being changed, and which in any event was denied as untimely, (ECF No. 36-3).[6]  Bennett reiterates that the relevant grievance is Grievance Number 1088135, as stated in his Amended Complaint, and claims that he fully exhausted that grievance and requested copies of those records, which he has yet to receive.  (ECF No. 38 at 26; ECF No. 39 at 11-14.)  Since the parties

---

[6] The Defendants discuss Grievance Number 1088231, but that grievance does not appear to relate to the claims at issue in this case.

dispute the relevant grievance, and given Bennett's assertion that the Court does not have the complete grievance record before it, the Court declines to rule on this issue prior to discovery.

As for the grievance pertaining to Hensley, the parties dispute whether Bennett adequately appealed that grievance to SOIGA. According to an inmate request attached to the Amended Complaint, on July 26, 2024, Bennett sought information about "long overdue" Facility Manager responses to certain of his grievances, including Grievance Number 1089753 pertaining to Hensley. (Am. Compl. at 37.) In that request, Bennett asked whether his transfer on July 11, 2024 "resulted in a delay or the jail mail being lost" while he was "attempting to exhaust [his] administrative remedies" and noted that he had "contacted S.O.I.G.A. and informed office of delay and requested extension." (*Id.* at 37.) The August 7, 2024 response he received to his inmate request reported that the grievance was processed on July 2, 2024, and provided him with a copy of that response. (*Id.*) Another exhibit shows that Bennett's request for a "final review extension" to appeal his grievance against Hensley was denied. (*Id.* at 39.) The denial, which is dated September 19, 2024, was based on the reasoning that "additional copies of the responses were sent to [Bennett] on/around 8/7/24 and this office has not yet received appeals from you for these grievances." (*Id.*)

Bennett argues that the grievance process was essentially unavailable to him because, although he sought an extension when he failed to receive the Facility Manager's response due to his transfer, the "DOC Administrators denied his request for extension of time and failed to follow their own policies." (ECF No. 38 at 6, 27-28; *see also* Am. Compl. ¶¶ 111-29.) Whether a grievance process is "available" depends on whether it is "capable of use for the accomplishment of a purpose," "accessible[,] or may be obtained." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (quotation omitted). An administrative procedure is unavailable: (1) "when (despite

12

what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary prisoner can discern or navigate it"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44 (citation omitted).  Furthermore, "[w]henever a prison fails to abide by [its own] procedural rules, its administrative remedies have become unavailable, and inmates are deemed to have successfully exhausted their remedies for purposes of the PLRA." *Shifflett v. Korszniak*, 934 F.3d 356, 367 (3d Cir. 2019); *see also Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 154 (3d Cir. 2016).  At this stage of the litigation, the limited record reflects that Bennett sought an extension to appeal the denial of his grievance to SOIGA because he did not receive the Facility Manager's response due to his transfer or a delay in prison mail, but that—contrary to the procedures—his request was denied without taking these factors into account. *See* DC-ADM-804 § 2.B.1.c.  Further, it appears that, in denying Bennett's extension request, the DOC may have required Bennett to file an appeal with the extension request, which is not a clear application of the policy as written.  *See Helms v. Sorber*, No. 24-6928, 2026 WL 358286, at *9 (E.D. Pa. Feb. 9, 2026) ("Absent further clarity or instruction regarding how he was supposed to properly file an extension, the Court cannot conclude that [the plaintiff] failed to comply with the DC-ADM 804's timeliness and extension requirements.").  Accordingly, Hensley is not entitled to dismissal of the claims against him for failure to exhaust.

### C.  Deliberate Indifference to Serious Medical Needs

Stuebner and Dr. Glushakow both argue for dismissal of the Eighth Amendment claims against them on the basis that they were neither deliberately indifferent to Bennett's serious

medical needs nor sufficiently personally involved to support a basis for liability. (ECF No. 27-2 at 7-10; ECF No. 36 at 9-12.) To state an Eighth Amendment claim based on the failure to provide medical treatment, a prisoner must allege facts reflecting that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."[7] *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quotations and citations omitted). "A serious medical need [also] exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Deliberate indifference can be inferred from circumstantial evidence, and is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Montanez v. Price*, 154 F.4th 127, 141 (3d

---

[7] None of the Defendants questions whether Bennett's mental health needs were serious. *See Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017) (treating "serious mental healthcare issues" as serious medical needs).

Cir. 2025) (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017)), *petition for cert. filed*, 94 U.S.L.W. 3289 (U.S. Mar. 11, 2026) (No. 25-1073).  This standard is met when a delay or denial of medically necessary care is intended to inflict pain without medical justification or is based solely on a nonmedical reason without any effort to mitigate harm. *DiFraia v. Ransom*, 171 F.4th 622, 630 (3d Cir. 2026).  In contrast, allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation.  *See Spruill*, 372 F.3d at 235; *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993).  Inadequate care may nevertheless give rise to a deliberate indifference claim when a defendant "act[s] with the requisite state of mind when providing that inadequate care." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (citation omitted); *see also Palakovic*, 854 F.3d at 228 ("[P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition" (quotation omitted)).

The Amended Complaint alleges that Bennett, an inmate with a long, well-documented history of psychiatric issues, presented at the medical department "to be seen by medical staff" because he experienced a "serious emergent mental break" that caused him to destroy his cell following five days of psychological decline precipitated by his move from the facility's Residential Treatment Unit to a violent unit.  (Am. Compl. ¶¶ 26-31, 87.)  The Amended Complaint further alleges when Bennett was brought to the medical department, Nurse Stuebner, the medical professional who was present, contacted Dr. Glushakow, the psychiatrist on call, reflecting that these Defendants were the medical professionals responsible for addressing Bennett's mental health needs at the time.  (*Id.* ¶¶ 37, 42, 45-47.)  Despite having been informed that Bennett "suffered some sort of mental issue after being up for five days" and having access

15

to his automated medical history, they placed him in a psychiatric cell for a day, where he allegedly received no treatment, because they "won't have to worry about him too much longer because he is gonna be transferred because of the lawsuit." (*Id.* ¶¶ 37-39, 45-48, 59-63; *see also id.* ¶ 87 (alleging that Stuebner and Glushakow denied "treatment/care" on May 7, 2024 despite being aware of Bennett's needs "solely to punish him for filing a lawsuit").) They also allegedly falsified records of the incident to suggest the incident was drug-related and to cover-up Dr. Glushakow's involvement. (*Id.* ¶¶ 53, 56, 58.) These allegations, read liberally and taken as true, support an inference that Stuebner and Dr. Glushakow were directly involved in Bennett's treatment decisions on May 7, 2024, and that despite knowing of his need for care due to his mental health history and the description of the incident, they opted to deny care for non-medical reasons, *i.e.*, to retaliate against him for filing the lawsuit.[8] *See Green v. Branson*, 108 F.3d 1296, 1304 (10th Cir. 1997) (observing that the denial of care "coupled with falsification of medical records" may support a deliberate indifference claim (citation omitted)); *Bennett*, 2024 WL 1486141, at *4 (E.D. Pa. Apr. 4, 2024) ("[W]e conclude that the Amended Complaint sufficiently alleges that Defendants Glushakow and Huyett were aware of Mr. Bennett's long history of psychiatric illness, self-harm, and suicide attempts at the time that they voted to removed him from the RTU and send him to be housed with the general population at SCI

---

[8] Stuebner claims that she was neither deliberately indifferent nor personally involved because her involvement was limited to making a telephone call. (ECF No. 27-2 at 7-10.) It is difficult to understand how a nurse staffed in the medical department who is presumably responsible for providing care to inmates, and who is presented with an inmate allegedly experiencing a psychiatric episode, would not be "personally responsible" for treating that inmate or ensuring that care is arranged by a capable provider. The same is true for Dr. Glushakow, who despite clear allegations that as the psychiatrist on-call he was aware of Bennett's psychiatric history and made decisions about how to handle Bennett following the May 7 incident, argues that Bennett failed to allege his personal involvement or that he was even aware Bennett required treatment. (ECF No. 36 at 9-10.)

Phoenix, where he would receive significantly fewer mental health services."). Accordingly, the Court will deny the motion to dismiss Bennett's Eighth Amendment claims.

### D. Retaliation

Defendants Stuebner and Glushakow also argue that Bennett has failed to state a retaliation claim against them. (ECF No. 27-2 at 10-11; ECF No. 36 at 12-13.) To state a plausible First Amendment retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (citation omitted); *see also Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2016). "[T]he filing of a lawsuit is a constitutionally protected activity." Meenan v. Harrison, 264 F. App'x 146, 152 (3d Cir. 2008) (citation omitted). Being transferred to a distant prison is sufficiently adverse, *Rauser*, 241 F.3d at 333, as is the denial of psychiatric care, *Snider v. Pa. DOC*, 505 F. Supp. 3d 360, 426 (M.D. Pa. 2020). As noted above, Bennett alleges that he overheard a conversation between Stuebner and Dr. Glushakow following his arrival at the medical unit, in which it was represented that they did not have to "worry" about Bennett because he would be "transferred because of the lawsuit," following which he was placed in a psychiatric observation cell without any treatment after his "mental break." These facts are sufficient to state a plausible retaliation claim based on the events of May 7, 2024.

Bennett also alleges that Dr. Glushakow participated in the retaliatory transfer. (Am. Compl. ¶¶ 89-91.) In support of this claim, Bennett alleges that Dr. Glushakow "admitted" on the escort video that Bennett would be transferred because of the 2022 lawsuit he filed, and that the day after his break-down, another defendant in the 2022 lawsuit, who is a friend of Dr.

Glushakow, filed a false report to generate the need for a separation.  (*Id.* ¶¶ 79, 89.)  He further

alleges that when he asked a Lieutenant for information about why he was being transferred, the

Lieutenant silently mouthed the word "lawsuit."  (*Id.* ¶ 70.)  Based on these allegations, Bennett

has alleged sufficient facts to proceed on his retaliatory transfer claim.

### E.  Civil Conspiracy

Dr. Glushakow also argues for dismissal of Bennett's conspiracy claims.  (ECF No. 36 at

13-14.)  It is clear from the Amended Complaint that Bennett brings these claims under state law.

(Am. Compl. at 18-19.)  Dr. Glushakow argues that Bennett has failed to allege sufficient facts to

support a claim that he conspired with Hensley to transfer Bennett away from SCI Phoenix.[9]

(ECF No. 36 at 14.)

"In Pennsylvania, 'to state a cause of action for civil conspiracy, the following elements

are required: (1) a combination of two or more persons acting with a common purpose to do an

unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act

done in pursuance of the common purpose; and (3) actual legal damage.'"  *Gen. Refractories Co.*

*v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (quoting *Strickland v. Univ. of*

*Scranton*, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)).  "To allege a plausible claim of civil

conspiracy, a plaintiff must make 'factual allegations of combination, agreement, or

understanding among all or between any of the defendants [or coconspirators] to plot, plan, or

conspire to carry out the alleged chain of events.'"  *Reese v. Pook & Pook, LLC.*, 158 F. Supp. 3d

---

[9] The Amended Complaint sets forth two conspiracy claims against Dr. Glushakow.  The first alleges that Dr. Glushakow and Stuebner conspired to "tamper with Bennett's medical/mental health records."  (Am. Compl. ¶ 92.)  Since Dr. Glushakow does not meaningfully address this claim in his motion, (*see* ECF No. 36 at 13-14), the Court will also not address it.  The second conspiracy claim alleges that Dr. Glushakow and Hensley conspired to transfer Bennett for filing a lawsuit.  (Am. Compl. ¶¶ 93-95.)

271, 292 (E.D. Pa. 2016) (quoting *Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997)) (alteration in original).  "It is not enough that the 'end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism.'"  *Id.* (quoting *Spencer*, 968 F. Supp. at 1020).  Although Bennett alleges that it was Hensley who authorized his transfer, the Amended Complaint does not raise sufficient allegations to support an inference that Bennett and Hensley reached an agreement to have him transferred or had any interactions about the transfer, even if they acted in parallel.  *See Twombly*, 550 U.S. at 556 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.").  Accordingly, the Court will dismiss Bennett's civil conspiracy claim against Dr. Glushakow based on the allegedly retaliatory transfer.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant the Motion to Dismiss the civil conspiracy claim against Dr. Glushakow based on the alleged retaliatory transfer and otherwise deny the Motions.  The Defendants will be directed to file an answer.  Additionally, the Court will deny Bennett's Motion to Sanction Dr. Glushakow based on the failure to notify Bennett of the subpoena Dr. Glushakow sent to SOIGA because Bennett has not identified any objections he would raise to the subpoena and has not been prejudiced in any respect.  *See Pagan-Colon v. Walgreens of San Patricio, Inc.*, 264 F.R.D. 25, 28 (D.P.R. 2010) (declining to issue sanctions where party was not prejudiced despite lack of notice).  An Order follows.

BY THE COURT:

/s/ John R. Padova

**JOHN R. PADOVA, J.**